UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-20468-CR-ALTMAN/LETT

18 U.S.C. § 1956(h)
18 U.S.C. § 982(a)(1)

FILED BY ___mp___ D.C.
Oct 23, 2024
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

UNITED STATES OF AMERICA

v.

**RAUL GORRIN BELISARIO,**

    Defendant.

_____/

### INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment, unless otherwise specified:

#### Relevant Individuals and Entities

1. The defendant, **RAUL GORRIN BELISARIO**, was a Venezuelan national and owner of a television news network and insurance company in Venezuela.

2. Francisco Convit Guruceaga ("Convit") was a Venezuelan national and a business partner of Conspirator 1.

3. Conspirator 1 was a Venezuelan national and a business partner of Convit. Conspirator 1 and Convit were known together as "Bolichicos" or "Bolis," members of the "boliburgues," a group of well-connected Venezuelans with political and economic influence within Venezuela.

4. Carmelo Antonio Urdaneta Aqui ("Urdaneta") was a Venezuelan national and the Legal Counsel to the Venezuelan Ministry of Oil and Mining. Urdaneta was a "foreign official"

as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-3(f)(2)(A).

5.     Petróleos de Venezuela, S.A. ("PDVSA") was Venezuela's state-owned and controlled oil entity.

6.     Alvaro Ledo Nass ("Ledo") was a Venezuelan national and the Secretary of the Board and General Counsel of PDVSA. Ledo was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

7.     Venezuelan Official 1 was a Venezuelan national and a senior finance executive at PDVSA. Venezuelan Official 1 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

8.     Venezuelan Official 2 was a Venezuelan national and a senior finance executive at PDVSA, having replaced Venezuelan Official 1 during the relevant time period. Venezuelan Official 2 was also a former high-ranking official of Venezuela and close relative of a high-ranking elected executive of Venezuela. Venezuelan Official 2 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

9.     Conspirator 2, Conspirator 3, and Conspirator 4 were Venezuelan nationals and close relatives of a high-ranking elected executive of Venezuela. Together, they were also known as "Los Chamos" or "Chicos." The latter reference sometimes included Venezuelan Official 2, their close relative.

10.    Conspirator 5 was a Venezuelan national and a close relative and a business partner of **RAUL GORRIN BELISARIO**.

11.    Jose Vicente Amparan Croquer, a.k.a., "Chente," ("Amparan") was a Venezuelan national and a financial asset manager for **RAUL GORRIN BELISARIO**, as well as Urdaneta,

Venezuelan Official 2, Conspirator 2, Conspirator 3, Conspirator 4, and Conspirator 5, among others. Amparan was a business partner of Ralph Steinmann and Luis Fernando Vuteff (both further identified below). In or around 2013, Amparan introduced **GORRIN** to Ralph Steinmann, who onboarded **GORRIN** and Conspirator 5 as clients of European Financial Institution 1. Amparan served as a middleman between **GORRIN** and Conspirator 5 and European Financial Institution 1.

12. Ralph Steinmann ("Steinmann") was a Swiss national and a financial asset manager for **RAUL GORRIN BELISARIO**, as well as Urdaneta, Ledo, Venezuelan Official 2, Conspirator 2, Conspirator 3, Conspirator 4, and Conspirator 5, among others. Steinmann was the owner of European Financial Institution 1.

13. Luis Fernando Vuteff ("Vuteff") was an Argentinian national and a financial asset manager for **RAUL GORRIN BELISARIO**, as well as Urdaneta, Ledo, Venezuelan Official 2, Conspirator 2, Conspirator 3, Conspirator 4, and Conspirator 5, among others. Vuteff was a managing employee of European Financial Institution 1.

14. Hugo Andres Ramalho Gois ("Gois") was a Portuguese national and a financial asset manager for **RAUL GORRIN BELISARIO**, as well as Urdaneta, Conspirator 2, Conspirator 3, Conspirator 4, and Conspirator 5, among others. Gois worked with Steinmann and Amparan, and had banking relationships with financial institutions in the United Kingdom, Latvia, and elsewhere in Europe.

15. Matthias Krull ("Krull") was a German national and a Panamanian resident. Krull was a high-level banker specializing in Venezuelan clients at a large Swiss bank and was the personal banker for **RAUL GORRIN BELISARIO**, Conspirator 1, and Conspirator 5.

16. Financial Manager 1 was a Panamanian resident who was enlisted by Urdaneta to assist in laundering approximately €78 million for the benefit of Urdaneta, Ledo, Convit, and Conspirator 1, among others.

17. Mario Enrique Bonilla Vallera ("Bonilla") was a Venezuelan national and a nominee director of shell companies organized and/or managed by **RAUL GORRIN BELISARIO**, Conspirator 5, Amparan, Steinmann, and Vuteff for the ultimate benefit of Conspirator 2, Conspirator 3, and Conspirator 4.

18. European Financial Institution 1 was a Swiss and Cayman Islands financial institution owned by Steinmann. Vuteff was a managing employee of European Financial Institution 1. European Financial Institution 1 served as the intermediary between European Financial Institution 2 and Amparan and **RAUL GORRIN BELISARIO** and Conspirator 5.

19. European Financial Institution 2 was a Maltese financial institution with banking relationships in Malta, Austria, Switzerland, and Canada.

20. Skystream Capital L.P. ("Skystream") was a Scottish shell company with a nominee director that was controlled and beneficially owned by **RAUL GORRIN BELISARIO**.

21. Unicorn Private Equity Advisors Ltd. ("Unicorn") was a Hong Kong shell company with a nominee director that was controlled by **RAUL GORRIN BELISARIO**, Conspirator 5, and other co-conspirators. Among other things, Unicorn was used to purchase a luxury yacht for Conspirator 5.

22. Rantor Capital C.A. ("Rantor") was a Venezuelan shell company controlled by **RAUL GORRIN BELISARIO** and co-conspirators.

23. Eaton Global Services Limited ("Eaton") was a Hong Kong shell company that was beneficially owned and controlled by **RAUL GORRIN BELISARIO** and Conspirator 5. Through

4

European Financial Institution 1, Steinmann and Vuteff facilitated the incorporation of Eaton for the ultimate benefit of **GORRIN** and Conspirator 5.

24. Andiron Corporation S.A. ("Andiron") was a Panamanian shell company that was beneficially owned and controlled by **RAUL GORRIN BELISARIO**, with overseas bank accounts managed by Amparan, Steinmann, Vuteff, European Financial Institution 1, and European Financial Institution 2.

25. Shell Company 1 was a Panamanian shell company beneficially owned and controlled by Conspirator 5, with overseas bank accounts managed by Amparan, Steinmann, Vuteff, European Financial Institution 1, and European Financial Institution 2.

26. Shell Company 2 was a Marshall Islands shell company whose nominee director and president was a close relative of Conspirator 5. Shell Company 2 was the nominal owner of a luxury yacht, the M/Y Blue Ice, for the benefit of Conspirator 5.

## CONSPIRACY TO COMMIT MONEY LAUNDERING
## (18 U.S.C. § 1956(h))

From in or around 2014 and continuing through at least in or around July 2018, in the Southern District of Florida, and elsewhere, the defendant,

**RAUL GORRIN BELISARIO,**

did knowingly and voluntarily combine, conspire, confederate, and agree with Francisco Convit Guruceaga, Conspirator 1, Carmelo Antonio Urdaneta Aqui, Alvaro Ledo Nass, Venezuelan Official 1, Venezuelan Official 2, Conspirator 2, Conspirator 3, Conspirator 4, Conspirator 5, Jose Vicente Amparan Croquer, Ralph Steinmann, Luis Fernando Vuteff, Hugo Andres Ramalho Gois, Matthias Krull, Financial Manager 1, and Mario Enrique Bonilla Vallera and other persons, known and unknown to the Grand Jury, to commit an offense defined in Title 18, United States Code, Section 1956, that is, to knowingly conduct and attempt to conduct a financial transaction affecting

5

interstate and foreign commerce, which financial transaction involved the proceeds of specified unlawful activity, knowing the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that such transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(l)(B)(i).

It is further alleged that the specified unlawful activity is: (a) a felony violation of the Foreign Corrupt Practices Act, in violation of Title 15, United States Code, Section 78dd-3; and (b) an offense against a foreign nation, specifically Venezuela, involving bribery of a public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, as provided by Title 18, United States Code, Section 1956(c)(7)(B)(iv).

### Purpose of the Conspiracy

The purpose of the conspiracy was for **RAUL GORRIN BELISARIO** and his co-conspirators to unlawfully enrich themselves by laundering the proceeds of a corrupt foreign loan and bribery scheme through a series of shell companies and overseas financial accounts that disguised and concealed the nature, location, source, ownership, and control of the illicit proceeds, including by transferring proceeds into and through bank accounts in the Southern District of Florida, and elsewhere, to purchase and maintain luxury assets, including yachts, real estate, and aircraft.

### Manner and Means of the Conspiracy

The manner and means by which **RAUL GORRIN BELISARIO** and his co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Florida and elsewhere:

1. In or around 2014, **RAUL GORRIN BELISARIO**, Conspirator 1, and Convit offered and agreed to pay bribes to certain Venezuelan officials, including Urdaneta, Ledo, and Venezuelan Official 1, among others, in exchange for the approval of foreign exchange loan contracts with Venezuela's state-owned and controlled oil entity, PDVSA.

2. Through these loan contracts, **RAUL GORRIN BELISARIO** and his co-conspirators sought to exploit the Republic of Venezuela's fixed foreign currency exchange rate, which valued the Venezuelan bolivar artificially high compared to the rate available on the open market.

3. As further discussed below, under the guise of one such loan contract, PDVSA paid Eaton the Euro equivalent of $600 million for a loan of Venezuelan bolivars worth only about $50 million on the open market, resulting in profits worth approximately $550 million.

4. The co-conspirators split these corrupt proceeds, using a portion to pay bribes to certain Venezuelan officials, including Urdaneta, Ledo, Venezuelan Official 1, and Venezuelan Official 2, among others, that were promised in exchange for their support and approval of the loan contract.

5. **RAUL GORRIN BELISARIO** and his co-conspirators then sought to double their illicit profits by increasing the value of the loan contract with PDVSA to $1.2 billion, and engaging Krull and Amparan, among others, to launder the additional criminal proceeds for their benefit.

6. In distributing the criminal proceeds among each other, **RAUL GORRIN BELISARIO** and his co-conspirators used offshore shell companies, foreign bank accounts, and false contracts that concealed and disguised the nature, location, source, ownership and control of the proceeds.

7. In furtherance of the laundering conspiracy, **RAUL GORRIN BELISARIO** and his co-conspirators conducted meetings and spent their criminal proceeds in the Southern District of Florida, including by purchasing a luxury yacht, the M/Y Blue Ice.

### A. Eaton-Rantor Loan Scheme

8. On or about November 28, 2014, Unicorn assigned to Rantor its rights to grant and make available a loan contract to PDVSA.

9. On or about December 15, 2014, the PDVSA Board of Directors approved entering into a loan contract with Rantor for 7.2 billion Venezuelan bolivars. The authorization was signed by Venezuelan Official 1, among others.

10. Also, on or about December 15, 2014, Eaton entered into sham joint-venture contracts with shell companies controlled and beneficially owned by Convit, Urdaneta, Conspirator 2, Conspirator 3, Conspirator 4, and Venezuelan Official 2, among others. The purpose of these sham contracts was to justify the distribution of the profits from the corrupt loan contract and evade anti-money laundering measures in the international banking system that would flag their transactions without such justification, including because they involved transfers to politically exposed persons (PEPs), which are persons entrusted with positions that are susceptible to bribery or corruption.

11. On or about December 17, 2014, PDVSA entered into a loan contract with Rantor for 7.2 billion Venezuelan bolivars. The loan contract was executed by Venezuelan Official 1 and was affixed with a seal of approval from the PDVSA General Counsel's Office, a position then held by Ledo.

12. On or about December 22, 2014, Rantor assigned to Eaton its rights as PDVSA's creditor under the loan contract.

13. Also, on or about December 23 or 30, 2014, in a letter addressed to Venezuelan Official 1, Eaton informed PDVSA of the assignment of Rantor's creditor rights to Eaton, and offered PDVSA the right to cancel the debt within 180 days by paying approximately $600 million. The letter also instructed PDVSA to wire the funds to Eaton via European Financial Institution 2, identifying an account that is located in the United States, among other accounts.

### B. Laundering of Bribery Profits Through Eaton

14. In accordance with the letter referenced in paragraph 13, between on or about December 29, 2014, and on or about February 2, 2015, PDVSA transferred a total of over €511 million (the Euro equivalent of the approximately $600 million referenced in paragraph 13) to accounts held by Eaton at European Financial Institution 2, which transfers, in part, were made through a bank account in the United States.

15. The co-conspirators split their profits from the corrupt loan contract – amounting to approximately €450 million – between **RAUL GORRIN BELISARIO** and the "Bolichicos," that is, Convit and Conspirator 1.

16. From this initial split, **RAUL GORRIN BELISARIO** was responsible for paying Conspirator 2, Conspirator 3, Conspirator 4, and Venezuelan Official 2, while Convit and Conspirator 1 were responsible for paying bribes to the other Venezuelan officials, including Urdaneta, Ledo, and Venezuelan Official 1, among others.

17. As part of the half portion owed to Convit and Conspirator 1, **RAUL GORRIN BELISARIO** and other co-conspirators caused the transfer of the corrupt proceeds from Eaton's accounts at European Financial Institution 2 to accounts held by Convit and Conspirator 1's shell companies, a trust controlled by Financial Manager 1, and Urdaneta's shell company.

18. For example, between on or about December 31, 2014, and on or about March 4, 2015, a total of approximately €125 million derived from the corrupt loan contract was transferred from Eaton's accounts at European Financial Institution 2 to Swiss accounts held by two British Virgin Islands' shell companies controlled and beneficially owned by Convit and Conspirator 1.

19. Then, between on or about January 23, 2015, and on or about February 3, 2015, a total of approximately $86 million in corrupt proceeds was further transferred to a Swiss bank account held by a Panamanian shell company beneficially owned and controlled by Conspirator 1. Conspirator 1 subsequently conducted U.S.-dollar transactions with a portion of the proceeds.

20. In addition, between on or about January 13, 2015, and on or about February 2, 2015, a total of approximately €78 million in corrupt proceeds was transferred from Eaton's accounts at European Financial Institution 2 to a St. Lucian bank account held by a New Zealand trust controlled by Financial Manager 1.

21. In or around January 2015, Convit, Urdaneta, and Financial Manager 1 had several conversations regarding the laundering of the corrupt proceeds, often via BlackBerry Messenger chats and while Convit was present in the Southern District of Florida.

22. At the direction of Urdaneta and other co-conspirators, Financial Manager 1 distributed the corrupt proceeds for the benefit of Urdaneta, Ledo, and Venezuelan Official 1, among others. A portion of the approximately €78 million was converted to U.S. currency, and more than $11 million in corrupt proceeds was transferred to acquire high-end apartments in Panama for the benefit of Urdaneta and Ledo as part of their bribe payments.

23. On or about February 9, 2015, approximately €23 million in corrupt proceeds was transferred from Eaton's accounts at European Financial Institution 2 to a Swiss account for a Panamanian shell company that was beneficially owned and controlled by Urdaneta and his

relatives. A portion of the approximately €23 million, which was from Convit and Conspirator 1's share of the proceeds, was converted to U.S. currency, and more than $3 million in corrupt proceeds was transferred to a real-estate title company account in the Southern District of Florida to purchase apartments in Miami Beach, Florida.

24. In total, about half of the proceeds from the corrupt loan contract (approximately €226 million of €450 million) was distributed from Eaton's accounts at European Financial Institution 2 to the "Bolichicos," that is, Convit and Conspirator 1, or others on their behalf.

25. With the remaining half, **RAUL GORRIN BELISARIO** funded internal transfers from Eaton's accounts to other shell company accounts at European Financial Institution 2, which were justified by sham joint-venture contracts. Within European Financial Institution 2, there were additional internal transfers between these shell company accounts, which were supported, in part, by documentation showing that three of the shell companies were the nominal shareholders of a fourth shell company, which was a Belize company with a nominee director. From these shell company accounts at European Financial Institution 2, the co-conspirators caused external transfers of their corrupt proceeds to accounts at other financial institutions held by the same shell companies for the benefit of Conspirator 2, Conspirator 3, Conspirator 4, and Venezuelan Official 2.

26. By structuring these transactions in this manner—that is, by making internal transfers between accounts at European Financial Institution 2 and then external transfers between accounts held by the same shell companies, **RAUL GORRIN BELISARIO** and his co-conspirators disguised and concealed the corrupt proceeds to avoid the bank scrutiny that accompanies external transfers between different accountholders.

27. For example, within European Financial Institution 2, proceeds from the corrupt loan contract were transferred from Eaton's accounts to a Scottish shell company account using a sham joint-venture contract as justification. Then, on or about March 6, 2015, and on or about March 12, 2015, a total of more than $2.46 million in corrupt proceeds was transferred from that shell company's accounts at European Financial Institution 2 to a bank account in Miami, Florida held by a yacht sales company for the purchase of a yacht for the benefit of co-conspirators.

28. In addition, **RAUL GORRIN BELISARIO** and Conspirator 5 also sought the assistance of their personal banker, Krull, in moving approximately $200 million for the benefit of Conspirator 2, Conspirator 3, and Conspirator 4. In or around late 2016 and in or around 2017, Krull met with **GORRIN** in the Southern District of Florida to discuss finding an alternative bank for these funds.

29. Through European Financial Institution 1, Steinmann and Vuteff were responsible for ensuring that transfers occurred from the corrupt proceeds at European Financial Institution 2. Steinmann and Vuteff would receive instructions from Amparan, who was acting on behalf of **RAUL GORRIN BELISARIO** and Conspirator 5 and then direct European Financial Institution 2 to execute certain transfers, including U.S.-dollar transactions to the Southern District of Florida and elsewhere.

30. For these transactions, Vuteff periodically sent, via email, to Amparan and others, spreadsheets that accounted for how the corrupt proceeds were used. For instance, on or about September 22, 2015, Vuteff sent an email to Amparan, copying Steinmann, with the subject line "NUMEROS RG[.]" Attached to the email was a spreadsheet file with several tabs for different spreadsheets.

31. On a tab labeled "RESUMEN[,]" a spreadsheet showed that 50 percent of the corrupt proceeds went to "BOLI[,]" referring to the "Bolichicos," while the remaining 50 percent was distributed to "RG[,]" referring to **RAUL GORRIN BELISARIO**. The spreadsheet showed that the proceeds allocated to "RG" were further divided between him and "CHAMOS[,]" referring to Conspirator 2, Conspirator 3, and Conspirator 4.

### C. Laundering for Defendant's Benefit

32. In addition, the spreadsheet file referenced in paragraph 30 contained tabs labeled "SALIDAS RG" and "GP" that documented transactions made for the benefit of **RAUL GORRIN BELISARIO** and Conspirator 5, respectively. These spreadsheets summarized how **GORRIN** and Conspirator 5 spent their portion of the corrupt proceeds, which totaled approximately €65 million, on expenses related to yachts, private aircraft, and other high-end assets in the Southern District of Florida and elsewhere.

33. For example, on or about January 13, 2015, approximately $4,050,000 was transferred from Eaton's accounts at European Financial Institution 2 to a bank account held by an aircraft title services company in Oklahoma City, Oklahoma at the direction of **RAUL GORRIN BELISARIO**.

34. In addition, on or about June 5, 2015, approximately $649,000 was transferred from Eaton's accounts at European Financial Institution 2 to a bank account in Miami, Florida to pay yacht expenses incurred for the M/Y Eloina, at the direction and for the benefit of **RAUL GORRIN BELISARIO**.

35. Also, a portion of the corrupt proceeds was converted to U.S. currency and approximately $45 million was internally transferred in European Financial Institution 2 from accounts held by Eaton to accounts held by Andiron, another shell company controlled and

beneficially owned by **RAUL GORRIN BELISARIO**. From Eaton and Andiron's accounts at European Financial Institution 2, **GORRIN** and Conspirator 5 acquired the M/Y Blue Ice, a luxury yacht, through the following transactions:

   a. On or about September 29, 2015, approximately $541,614 was transferred to a bank account in Miami, Florida held by a yacht sales company;

   b. On or about December 1, 2015, approximately $1,000,000 was transferred to the same bank account in Miami, Florida held by a yacht sales company; and

   c. On or about December 8, 2015, approximately $1,500,000 was transferred to the same bank account in Miami, Florida held by a yacht sales company.

36. In addition, on or about December 10, 2015, approximately $1,000,000 was transferred from a Latvian account held by Unicorn to the same bank account in Miami, Florida held by a yacht sales company. Unicorn was the nominal buyer of the M/Y Blue Ice, but title was ultimately transferred to Shell Company 2 whose nominal director and president was a close relative of Conspirator 5.

37. **RAUL GORRIN BELISARIO** and Conspirator 5 also transferred criminal proceeds between their shell company accounts at European Financial Institution 2 to conceal and disguise their nature, location, source, ownership, and control.

38. For example, Eaton transferred proceeds from the corrupt loan contract from its accounts at European Financial Institution 2 to its accounts at an Austrian bank. Then, on or about February 17, 2015, approximately $1,978,000 was transferred from the Eaton account at the Austrian bank to a Shell Company 1 account at a Swiss bank. This transaction was later justified to the Swiss bank in an email that copied Conspirator 5 as a transfer between the same beneficiaries

because both Eaton and Shell Company 1 belonged to **RAUL GORRIN BELISARIO** and Conspirator 5.

39. After receipt of the approximately $1,978,000 in Shell Company 1's Swiss account, approximately CHF569,395 (Swiss Francs) was transferred on or about February 18, 2015, to a Swiss shell company account that was controlled and beneficially owned by **RAUL GORRIN BELISARIO** and Conspirator 5. Thereafter, on or about February 23, 2015, approximately $57,283 was transferred to an aviation insurance company in Key Biscayne, Florida, for a Gulfstream aircraft's insurance renewal.

### D. Doubling Eaton-Rantor Loan to $1.2 Billion and Additional Laundering

40. In the spring of 2015, **RAUL GORRIN BELISARIO** and Conspirator 1 contacted Urdaneta to discuss doubling the original amount of the corrupt loan contract with PDVSA to cover an additional $600 million, for a total of $1.2 billion.

41. On or about April 15, 2015, the PDVSA Board of Directors approved amending the loan contract with Rantor, increasing the original loan amount from 7.2 billion Venezuelan bolivars to 14 billion Venezuelan bolivars. The authorization was signed by Venezuelan Official 2, among others.

42. In or around the fall of 2016, **RAUL GORRIN BELISARIO** and Conspirator 5 sought Krull's assistance in laundering the additional $600 million, providing Krull with the amended corrupt loan contract with PDVSA for 14 billion Venezuelan bolivars and other documents regarding European Financial Institution 2, which had been forwarded via email to Krull from **GORRIN**, who in turn, had received the information via email from Conspirator 5.

### E. Payment of Laundering Fees

43. A portion of the corrupt proceeds also was used to pay the financial managers, including Steinmann, Vuteff, and Financial Manager 1, who were engaged to create sophisticated financial mechanisms designed to conceal and disguise the corrupt proceeds, and launder the funds for the benefit of **RAUL GORRIN BELISARIO** and other co-conspirators.

44. Vuteff and Steinmann facilitated the creation of and/or opened accounts for numerous shell companies for the benefit of **RAUL GORRIN BELISARIO** and Conspirator 5, including Eaton, Skystream, Unicorn, and Shell Company 1, among others.

45. In or around February 2015, Eaton paid an invoice from European Financial Institution 1, transferring nearly €2.2 million in proceeds from the corrupt loan contract from its accounts at European Financial Institution 2 to European Financial Institution 1. The transfer was justified by a January 15, 2015 invoice to Skystream that referenced an advisory agreement between European Financial Institution 2 and Skystream "dated 14.11.2014 for the execution of the Rantor Capital Assignment Agreement with [E]aton Global Services 27.12.2014[.]"

46. The agreement dated November 14, 2014 between European Financial Institution 1 and Skystream referenced the loan contract with PDVSA for 7.2 billion Venezuelan bolivars, and contracted European Financial Institution 1 "to advise and structure the execution of any claims and receivables" under a related credit agreement.

47. **RAUL GORRIN BELISARIO** and Conspirator 5 continued to pay laundering fees from Andiron and Shell Company 1 to European Financial Institution 1 until at least on or about April 17, 2018.

48. In addition, the co-conspirators paid fees to European Financial Institution 2. The spreadsheet file referenced in paragraph 30 reflected fees paid to European Financial Institution 2

16

in excess of €20 million. From these funds, European Financial Institution 2 also paid European Financial Institution 1 significant fees.

49. To date, European Financial Institution 2 continues to charge such fees for accounts opened for the benefit of the co-conspirators.

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATIONS
### (18 U.S.C. § 982(a)(1))

1. The allegations of this Indictment are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant, **RAUL GORRIN BELISARIO**, has an interest.

2. Upon conviction of a violation of Title 18, United States Code, Section 1956(h), as alleged in this Indictment, the defendant shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

3. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

 a. cannot be located upon the exercise of due diligence;

 b. has been transferred or sold to, or deposited with, a third party;

 c. has been placed beyond the jurisdiction of the court;

 d. has been substantially diminished in value; or

 e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 982(a)(1) and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

███████████████

FOREPERSON

_____
MARKENZY LAPOINTE
UNITED STATES ATTORNEY

_____
GLENN S. LEON
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
DEPARTMENT OF JUSTICE

_____
NALINA SOMBUNTHAM
ASSISTANT UNITED STATES ATTORNEY

_____
PAUL A. HAYDEN
TRIAL ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

CASE NO.: <u>**24-20468-CR-ALTMAN/LETT**</u>

v.

RAUL GORRIN BELISARIO,

_____/
          Defendants.

**CERTIFICATE OF TRIAL ATTORNEY**

**Superseding Case Information:**
New Defendant(s) (Yes or No) ____
Number of New Defendants ____
Total number of new counts ____

**Court Division** (select one)
☒ Miami     ☐ Key West     ☐ FTP
☐ FTL       ☐ WPB

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.
3. Interpreter: (Yes or No) <u>Yes</u>
   List language and/or dialect: <u>Spanish</u>
4. This case will take <u>12</u> days for the parties to try.
5. Please check appropriate category and type of offense listed below:

   (Check only one)
   I    ☐ 0 to 5 days
   II   ☐ 6 to 10 days
   III  ☒ 11 to 20 days
   IV   ☐ 21 to 60 days
   V    ☐ 61 days and over

   (Check only one)
   ☐ Petty
   ☐ Minor
   ☐ Misdemeanor
   ☒ Felony

6. Has this case been previously filed in this District Court? (Yes or No) <u>No</u>
   If yes, Judge _____ Case No. _____
7. Has a complaint been filed in this matter? (Yes or No) <u>No</u>
   If yes, Magistrate Case No. _____
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) <u>Yes</u>
   If yes, Judge <u>Williams</u> Case No. <u>18-20685-CR-KMW; see attached case list.</u>
9. Defendant(s) in federal custody as of _____
10. Defendant(s) in state custody as of _____
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) <u>No</u>
13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) <u>No</u>
14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) <u>No</u>
15. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? <u>No</u>
16. Did this matter involve the participation of or consultation with now Magistrate Judge Marta Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? <u>No</u>

By: _____
Nalina Sombuntham
Assistant United States Attorney
FL Bar No.    96139

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** RAUL GORRIN BELISARIO

**Case No:** _____

Count #: 1

Conspiracy to Commit Money Laundering

Title 18, United States Code, Section 1956(h)
* **Max. Term of Imprisonment:** Twenty (20) years' imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):** N/A
* **Max. Supervised Release:** Three (3) years' supervised release
* **Max. Fine:** $500,000 or twice the value of the property involved, whichever is greater

*Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.